**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-052**

**Filing Date:  April 28, 2010**

**Docket No. 28,407**

**ANDALUCIA DEVELOPMENT
CORPORATION, INC., a New Mexico
corporation, and SPS INVESTMENTS, LC,
a New Mexico limited liability company,**

    **Appellees-Respondents,**

**v.**

**THE CITY OF ALBUQUERQUE, a municipal
corporation, and the ALBUQUERQUE CITY
COUNCIL, the governing body of the City of
Albuquerque,**

    **Appellants-Petitioners.**

**ON A WRIT OF CERTIORARI FROM THE DISTRICT COURT OF
BERNALILLO COUNTY
William F. Lang, District Judge**

Rodey, Dickason, Sloan,
Akin & Robb, P.A.
John P. Salazar
Edward R. Ricco
Amanda C. Sanchez
Albuquerque, NM

for Appellees

Robert W. White, City Attorney
Mark A. Hirsch, Deputy City Attorney
Kevin J. Curran, Assistant City Attorney
Albuquerque, NM

for Appellants

1

**OPINION**

**KENNEDY, Judge.**

**{1}**     Pursuant to a writ of certiorari, requested by the City of Albuquerque, we review the district court's application of a municipal impact fee ordinance and its attendant regulations. The ordinance at issue, passed on December 10, 2004, by the City of Albuquerque and the Albuquerque City Council (City), exempts developers from paying impact fees when they possess development rights that vested prior to the ordinance's date of enactment. City of Albuquerque, N.M., Code of Ordinances § 14-19-1-12(D) (2004) (amended 2009) (hereinafter ROA). Respondents, Andalucia Development Corporation, Inc., and SPS Investments, LC (Developers), argue they were improperly required to pay the fee. Developers claim that under the ordinance, a developer's rights in property vest at the time the city's Environmental Planning Commission (EPC) approves an unplatted subdivision site plan.[1] The district court agreed. We reverse.

**{2}**     As we explain below, our interpretation indicates that a developer's rights vest under the ordinance when the city approves a reliable platting pattern for a subdivision. The district court improperly held that Developers' rights vested prior to the enactment of the ordinance and incorrectly found that Developers had received "approval" under *Brazos Land, Inc. v. Board of County Commissioners*, 115 N.M. 168, 170, 848 P.2d 1095, 1097 (Ct. App. 1993), creating common law vested rights. Such an analysis confuses the common law doctrine of vested rights with the vested rights contemplated by the ordinance. As a result, we hold that the court erroneously invalidated the ordinance's two-year sunset provision.

**BACKGROUND**

**{3}**     The facts of this case are undisputed. In March 2001, the EPC approved a site plan for subdivision of lands owned by Ray A. Graham, III, which included eight individual tracts. Although no tracts were platted, the approved plan established tract boundaries, vehicle access, bicycle and trail access, public transit access, internal circulation requirements, building heights, setbacks, and common landscape standards. It provided zoning for the entire development and annexation of a small portion from Bernalillo County to the City. The plan stated that its goal would be to eventually plat each tract. Thereafter, the development proceeded in three phases. Phase 1 received approval in August 2003, and Phase 2 received approval in November 2004. But  Phase 3, the property at issue in this

---

[1]The term, "plat," as used in this opinion, is defined as "[a] graphic and written description of a lot or lots with survey reference ties to permanent survey monuments." ROA § 14-14-1-6. In order to obtain subdivision approval, a developer must submit three such plats:  a sketch plat, followed by a preliminary plat, and then a final plat. ROA § 14-14-3-2(B) (1974). The sketch plat is first submitted to the City, which makes recommendations that are later reflected in the preliminary plat. When the preliminary plat is approved, the City has made a "commitment . . . that a final plat conforming to the approved preliminary plat and any conditions will be approved." ROA § 14-14-3-4(A) (2007). The final plat is the recorded, "legal instrument which will allow transfer of land within the subdivision to take place." ROA § 14-14-3-5(A)(1) (1974).

case, was not approved until August 2005, more than seven months after passage of the impact fee ordinance.

{4}     The EPC approved Phase 1 in August 2003 as an amendment to the original site plan for subdivision. That amendment indicated Phase 1's lot platting and further subdivided Tract 1 into four smaller tracts that were designated 1A through 1D. It also designated Tracts 1B through 1D as "bulk [t]racts for future development." It is Tract 1C with which we are concerned in this case. In September 2003, the property was sold to Developers, which then invested in further plans and improvements, including the submission of two additional amendments to the original site plan for subdivision covering Phases 2 and 3. In November 2004, the EPC approved the first of those, which was a second amendment to the original site plan for subdivision. It designated a platting pattern for Phase 2 of the development and, like the amendment to develop Phase 1, designated Tracts 1C through 1D as "bulk [t]racts for future development."

{5}     The next month, on December 10, 2004, the City passed the ordinance at issue in this case. That ordinance requires developers to pay impact fees for development of new property within the city and exempts those whose rights vested prior to its enactment. ROA § 14-19-1-1; § 14-19-1-12(D). In August 2005, Developers received the third and final approval for amendment of the original site plan. That amendment provides for Phase 3 of the development and designates a platting pattern and subdivision layout for Tract 1C. On November 30, 2005, the City determined that Developers had vested rights in Phases 1 and 2 prior to the enactment date of the ordinance because the amendments covering those phases indicated platting patterns for individual lots. Property covered by Phases 1 and 2 was therefore exempt from impact fees. But because platting for Phase 3/Tract 1C was not approved until after enactment of the ordinance, the City determined that Developers' rights in that property were not vested within the exception. Thus, the City notified Developers that it would be required to pay impact fees for Phase 3/Tract 1C. Developers objected. They argued that the March 2001 original site plan for subdivision gave them vested rights in Phase 3/Tract 1C, but the City's Impact Fee Administrator (IFA) was unpersuaded. As he explained, "the original [March 2001] site development plan for subdivision was for a bulk land plat [and such a plan] does not rise to the level of a right to proceed with development because it only defines the zoning parameters or entitlements for a parcel—the parcel will require further review and approval to acquire . . . development rights."

{6}     Developers challenged the IFA's decision and appealed to the EPC. Again, Developers argued that the EPC's March 2001 approval of the original site plan for subdivision conferred vested rights. As a result, their rights in Phase 3/Tract 1C vested prior to the enactment of the impact fee ordinance and should trigger the exemption. This argument failed to persuade the EPC, which concluded that such vested rights "are those that would allow a property owner to proceed with development subject to technical compliance with the approved site development plan." Bulk land subdivision plans, like the one submitted in March 2001 do not confer development rights

> because they require . . . further intermediary approval to proceed with
> development, and are therefore not the type of approval that establishes
> vested rights. . . .   The approval of a bulk land subdivision or a site

3

development plan for a bulk land subdivision does not result in a vested right under the impact fee ordinances.

Those approvals do not "allow a property owner to proceed to develop" the property.

{7}     Developers renewed their argument on appeal to the City, which appointed an independent hearing officer to consider the matter. The hearing officer recommended that the City reverse the decision of the EPC, stating that "the number of future approvals necessary [for development of the property] is irrelevant." The original approval of Developers' site plan for subdivision was, he stated, sufficient for impact fee exemption under the ordinance. However, despite the hearing officer's recommendation, the City decided to hold its own hearing, and it did so on August 21, 2006. Afterwards, it published a decision along with formal findings of fact, finding that "[a] development that [has] not progressed to the point of having committed to any specific lot configuration, location or layout should not be considered to have a vested right for purposes of avoiding impact fees." "[W]ith respect to the land now at issue [Phase 3/Tract 1C] there was no approval [prior to the ordinance's enactment] for any lots . . . such as were intended to constitute a vested right." Thus, stating that the interpretation of the IFA was entitled to deference, the council affirmed the EPC decision denying the exemption to Phase 3/Tract 1C and disregarded the conclusion of the independent hearing officer.

{8}     Developers again sought review, this time in the district court. Oral arguments were held on January 8, 2008, and the court reviewed the case on its merits, reversing the decision of the city council. In its written order, it found that Developers' rights in Phase 3/Tract 1C of the project vested at the time the EPC approved the original site plan for subdivision in March 2001. The court concluded that Developers' rights were vested under common law because Developers "purchased Tracts 1 and 2 subsequent to [March 2001] in reliance upon the approved Original Site Plan and substantially changed [their] position by expending millions of dollars in furtherance of developing [those tracts] prior to" enactment of the impact fee ordinance. The court cited *Brazos Land* in support of its decision. That case provides a two-pronged test for whether a party's rights are vested: "First there must be approval by the regulatory body, and second, there must be a substantial change in position in reliance thereon." *Brazos Land*, 115 N.M. at 170, 848 P.2d at 1097. The court concluded that both prongs were met.

{9}     The court also found that Developers' rights vested under the language of the impact fee ordinance itself. Interpreting the ordinance, it concluded that "[v]ested rights recognized under the Impact Fees Ordinance are consistent with the common law vested rights in the development of Tracts 1 and 2, to which [Developers are] entitled." The original March 2001 site plan for subdivision "establishe[d] a development right," and, as stated in the Albuquerque Development Process Manual (DPM), a vested right "shall mean development rights." Thus, because Developers had a "development right," they also had "vested rights under the Impact Fees Ordinance."

{10}     Finally, the district court analyzed the ordinance's expiration provision. It states, "[v]ested rights arising from approvals shall expire if a building permit has not been issued within two years from the effective date and impact fees may be assessed and collected

4

thereafter." ROA § 14-19-1-12(D). Because common law vested rights are "established rights which cannot be taken away arbitrarily," the court concluded, "[t]he Expiration Provisions in the [ordinance] and the DPM are void and of no effect." Thus, "the [City's d]ecision to uphold the assessment of impact fees is *not in accordance with applicable law*, and therefore, should be reversed."

**{11}** On certiorari, the City argues that the decision was in accordance with applicable law. The district court erred, the City claims, and its order should be reversed. We agree because (1) the district court's interpretation of the ordinance was incorrect; (2) Developers did not meet the test for common law vested rights set out in *Brazos Land* and, at any rate, because a common law vested rights analysis is inapplicable to the vested rights exception in the ordinance; and (3) the district court improperly invalidated the ordinance's two-year sunset provision.

## DISCUSSION

### A. STANDARD OF REVIEW

**{12}** On certiorari in an administrative appeal of this type, we apply "the same statutorily defined standard of review as the district court." *Lantz v. Santa Fe Extraterritorial Zoning Auth.*, 2004-NMCA-090, ¶ 5, 136 N.M. 74, 94 P.3d 817. Thus, this Court may reverse decisions where "the administrative entity . . . acted fraudulently, arbitrarily, or capriciously; if the decision was not supported by substantial evidence in the whole record; or if [it] did not act in accordance with the law." *Miller v. Bd. of County Comm'rs*, 2008-NMCA-124, ¶ 16, 144 N.M. 841, 192 P.3d 1218 (alteration in original) (internal quotation marks and citation omitted). We "conduct the same review of an administrative order as the district court sitting in its appellate capacity, while at the same time determining whether the district court erred in the first appeal." *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 16, 133 N.M. 97, 61 P.3d 806 (filed 2002). We review any legal interpretations of the lower court de novo. *Gallup Westside Dev., LLC v. City of Gallup*, 2004-NMCA-010, ¶ 10, 135 N.M. 30, 84 P.3d 78 (filed 2003).

### B. ALBUQUERQUE'S IMPACT FEE ORDINANCE

**{13}** Under the New Mexico Development Fees Act, municipalities may assess impact fees on new development within their jurisdiction. NMSA 1978, § 5-8-3 (2001) (authorizing the imposition of impact fees for municipalities); NMSA 1978, § 5-8-2(I) (1993) (defining an impact fee as "a charge or assessment imposed by a municipality or county on new development in order to generate revenue for funding or recouping the costs of capital improvements or facility expansions necessitated by and attributable to the new development"); ROA § 14-19-(1-4)-4. On December 10, 2004, the City enacted an ordinance imposing such fees. *See* DPM ch. 18, § 3(B)(2)(c). In order to compensate for a given development's impact on public safety, roadways, drainage, and parks, *see* ROA § 14-19-(1-4)-6(A) ("Findings and Declarations"), the ordinance imposes fees on all new developments according to several criterion. ROA § 14-19-(1-4)-13(D)(1)-(4).

5

**{14}**     As stated above, the ordinance exempts developers from paying the fee as long as their development rights vested prior to December 10, 2004. ROA § 14-19-(1-4)-12(D). The exemption provides,

> Notwithstanding any other provision of § 14-19-1-1, development approvals resulting in vested rights acquired prior to the enactment date of § 14-19-1-1 are deemed to have satisfied the requirements of § 14-19-1-1 and no additional impact fees shall be assessed or collected against such properties under § 14-19-1-1. Vested rights arising from approvals shall expire if a building permit has not been issued within two years from the effective date and impact fees may be assessed and collected thereafter.

ROA § 14-19-1-12(D). In order to implement the ordinance, the City promulgated regulations that further define when a developer's rights vest. In pertinent part, those regulations begin with a simple restatement of the general exception from the city ordinance.

> c.     Development approvals resulting in vested rights acquired prior to December 10, 2004[,] shall not be subject to an impact fee. However, development approvals resulting in vested rights acquired prior to December 10, 2004[,] shall be subject to an impact fee if a building permit has not been procured within two (2) years of the effective date of the Impact Fee Ordinances.

DPM ch. 18, § 3(B)(2)(c). The regulation then attempts to clarify when a developer's rights vest under the ordinance.

> d.     For the purpose of the Impact Fee Ordinances and these Administrative Rules, vested rights shall mean development rights acquired and resulting from building permit approval, final plat approval, preliminary plat approval, or EPC or DRB site plan for subdivision or site plan for building permit approval obtained prior to the enactment date (December 10, 2004) of the Impact Fee Ordinance. Vested rights arising from such approvals shall expire if a building permit has not been issued within two (2) years from the effective date of the Impact Fee Ordinance and the impact fee may be assessed and collected thereafter.

DPM ch. 18, § 3(B)(2)(d). Finally, the ordinance defines a site plan for subdivision as

> (1)     An accurate plan at a scale of at least 1 inch to 100 feet which covers at least one lot and specifies:
>
> (a)     For Subdivision. The site, proposed use, pedestrian and vehicular ingress and egress, any internal circulation requirements and, for each lot, maximum building height, minimum building setback, and maximum total dwelling units and/or nonresidential uses' maximum floor area ratio.

ROA § 14-16-1-5(B)(1)(a).

**{15}** To summarize, any developer whose rights vested prior to December 10, 2004, is exempt from impact fees under the ordinance. ROA § 14-19-(1-4)-12(D). A developer's rights vest when that developer acquires "development rights" as a result of, for example, EPC approval of a site plan for subdivision. DPM ch. 18, § 3(B)(2)(d). Thus, we must determine when a developer acquires a development right. The City argues that such a right is created upon approval of a "reliable platting pattern," whereas Developers contends that a development right is created automatically upon EPC approval of a site plan for subdivision. We consider the merits of each.

**{16}** Both the city council and the city's IFA support the notion that a developer's rights do not vest until it receives approval for a reliable platting pattern. As the city council stated, any "development that ha[s] not progressed to the point of having committed to any specific lot configuration, location[,] or layout should not be considered to have a vested right." Mr. Jack Cloud is the city's IFA, and as such, he is the individual responsible for interpreting the DPM and assessing impact fees. He testified at both hearings before the independent hearing officer and the city council. At the city council hearing, he stated,

> You know, I think you have to interpret: Where is th[e] threshold [for vested rights]? What does "Site Plan for Subdivision" mean, in terms of a vested right?
>
> I would urge you to consider that [the subdivision] needs to have a platting pattern that gives [the developer] a reliance that, "Now we know what we're going to build here. We've got something going. We don't just have zoning parameters of height, setback, density. We have a platting pattern. We have gone through the steps to get far enough along in the development."

Once a reliable platting pattern has been approved, Cloud continued, "[t]he next few steps should not be a big deal. They should be a formality. Once you have that Site Plan [f]or Subdivision that shows your lots, the [Development Review Board] is, pretty much, bound to approve your preliminary plat and then bound to approve your final plat." Conversely, prior to approval of a reliable platting pattern for a subdivision's lots, further approvals from the EPC remain necessary, as no individual lots for houses or other structures have been designated.

**{17}** Developers argue that development rights are acquired much earlier in the process. They contend that EPC approval of a site plan for subdivision, without a platting pattern for individual lots, automatically confers development rights. The argument relies entirely upon: (1) the common law notion of vested rights, which we consider below; and (2) a plain language interpretation of DPM ch. 18, § 3(B)(2)(d). The plain language of that section states that "vested rights shall mean development rights acquired and resulting from" a site plan for subdivision approval by the EPC. *Id.* Neither party disputes that the March 2001 EPC approval at issue in this case was for a site plan for subdivision. *See* ROA § 14-16-1-5. Indeed, it is labeled as such. Thus, because they received such an approval, Developers

contend, they received development rights. Developers provide no other evidence of their vested rights outside of common law, which we discuss below.

**{18}** The problem with Developers' reading of the regulation lies in their assumption that a development right must *always* flow from EPC approval of a site plan for subdivision. Essentially, Developers argue that the two are equivalent. But DPM Chapter 18, Section 3(B)(2)(d) says something quite different. That section confers a vested right when a development right is acquired by, and results from, a site plan for subdivision approval. *Id*. This proposition could just as easily be stated in the negative; that is, when a development right is not acquired by, or resulting from, a site plan for subdivision approval, a vested right has not been conferred. Developers' interpretation is therefore incorrect. The City's position seems far more reasonable; it remains consistent with the language of the DPM, while at the same time setting an absolute threshold on the moment of vesting. Had the drafting committee for the DPM intended EPC approval of a site plan for subdivision to automatically create vested rights, it could have easily drafted the regulation to say as much. Instead, it chose to include various approvals *only* after they have created a development right. Furthermore, because the interpretation of the IFA was within his professional purview, was reasonable, and was not otherwise inconsistent with the law, we are compelled to accord it deference. *See Rio Grande*, 2003-NMSC-005, ¶ 25 (holding that courts "will confer a heightened degree of deference to legal questions that implicate special agency expertise or the determination of fundamental policies within the scope of the agency's . . . function" (internal quotation marks and citation omitted)); *Hyde v. Taos Mun.-County Zoning Auth.*, 113 N.M. 29, 31, 822 P.2d 126, 128 (Ct. App. 1991) (according substantial weight to a municipality's application of its own ordinance where the decision was "reasonable, supported by substantial evidence, and within" its authority). Therefore, we hold that under the ordinance a developer receives development rights consistent with DPM ch. 18, § 3(B)(2)(d) at the time it receives approval for a reliable platting pattern.

**{19}** Developers' original site plan for subdivision, approved by the EPC in March 2001, did not confer the development rights necessary to establish vested rights under the ordinance. That plan defines bulk land tracts, establishes zoning for the entire development, and seeks annexation for a portion not already within the City's boundaries. As the plan states, "Currently, all of the land covered by this Site Plan for Subdivision is unplatted. . . . The goal is to . . . plat all of these tracts." And under a description of the site itself, it states, "The site consists of unplatted land, approximately 230.8 acres[.]" Based on our interpretation of ROA § 14-19-(1-4)-12(D) and DPM ch. 18, § 3(B)(2)(d) above, we hold that such a site plan for subdivision, because it does not provide a reliable platting pattern, cannot confer development rights and likewise does not confer vested rights under the ordinance. The City also reached this conclusion, and because it was neither fraudulent, arbitrary, nor capricious, we hold that the district court erred in reversing it. *See Miller*, 2008-NMCA-124**,** ¶ 16.

**{20}** Yet, to complicate matters, the district court commingled its interpretation of vested rights under the ordinance with an application of common law vested rights under *Brazos Land*. The two are distinct. Indeed, as described below, if Developers were able to establish common law vested rights, the City's ordinance would cease to apply at all. There would thus be no need for an analysis of the exception. Nevertheless, we settle the matter by

8

holding that Developers established no common law vested rights. The March 2001 site plan for subdivision approved by the EPC was insufficient to constitute approval under *Brazos Land*, and thus, the City's decision to impose the fee was not contrary to law. *See Miller*, 2008-NMCA-124, ¶ 16.

## C. THE DISTRICT COURT INCORRECTLY CONCLUDED THAT DEVELOPERS' RIGHTS WERE VESTED AT COMMON LAW

{21} In New Mexico, the vested rights doctrine protects a developer from shifting governmental regulations. *KOB-TV, L.L.C. v. City of Albuquerque*, 2005-NMCA-049, ¶ 14, 137 N.M. 388, 111 P.3d 708. After a development has begun under one regulatory scheme, the doctrine restricts government from modifying that scheme or imposing another prior to the development's completion. *Id.* ¶ 13. In order to establish a vested right, a developer must prove two elements: (1) "approval by the regulatory body" and (2) a substantial change in position in reliance on that approval. *Brazos Land*, 115 N.M. at 170, 848 P.2d at 1097. The district court reasoned that the two prongs were met when, first, the EPC approved the original site plan for subdivision and, second, Developers purchased the property and expended "millions of dollars in furtherance of developing Tracts 1 and 2." That application of the law was incorrect. The EPC's approval of Developers' original site plan for subdivision was insufficient to constitute the approval necessary to confer a vested right.

{22} This Court's opinion in *Gallup Westside Development*, 2004-NMCA-010, guides our holding. In that case, a municipality issued final plat approval conditioned on the developer's completion of certain infrastructure improvements. *Id.* ¶ 2. The developer later claimed that their rights were vested, prohibiting the city from applying subsequent requirements. *Id.* ¶ 9. This Court applied the two-pronged test from *Brazos Land* and held that the developer satisfied neither. *Gallup Westside Dev.*, 2004-NMCA-010, ¶ 13. As the Court concluded, "The [c]ity did give final plat approval to the subdivision. Nevertheless, the first prong of the vested rights test is not met as long as revocation of that approval remains a possibility." *Id.* ¶ 14. Thus, where a municipality retains the discretion to deny final plat approval for a subdivision, there can be no vested right in a developer. *Id.* "A vested right is nothing more than the power to do certain actions or possess certain things lawfully." *KOB-TV*, 2005-NMCA-049, ¶ 16 (internal quotation marks and citation omitted). *In re Sundance Mountain Ranches, Inc.*, 107 N.M. 192, 194, 754 P.2d 1211, 1213 (Ct. App. 1988), heavily relied upon by *Brazos Land*, also supports our conclusion. As the Court held,

> [g]enerally, a property developer is vulnerable to shifts in zoning or other land use regulations occurring during the preparatory stages of his project. *By issuing approvals preparatory to a building permit, the government makes no representation that the developer will be exempt from changing land-use regulations*; he must comply with the ordinances in effect at the time he secures a building permit. Once the developer secures a building permit and expends a considerable sum of money in reliance on it, he may acquire a vested right which protects him against shifting governmental regulation.

*Sundance Mountain Ranches, Inc.*, 107 N.M. at 194, 754 P.2d at 1213 (internal quotation

9

marks and citation omitted) (emphasis added).  As the authors of American Law Reports state, prior to receiving a permit or a license to actually begin a particular project, a developer must abide by subsequently amended law.

> [I]t is generally acknowledged that a change in the law pending an application for a permit or license is operative as to such application, and that the law as changed, rather than as it existed at the time the application was filed, determines whether the permit or license should be granted.

R. J. Fox, Annotation, *Change in Law Pending Application for Permit or License*, 169 A.L.R. 584 (2009).

**{23}**    In the instant case, the City's March 2001 approval of Developers' site plan for subdivision activated no common law vested right.  That approval, titled "Site Plan for Subdivision," established zoning and annexation.  It established tract boundaries, setbacks, vehicular access, pedestrian access, and several other important preliminary matters.  Yet, it clearly remained subject to subsequent City approvals, and continuance of the project remained entirely within the City's discretion.  Indeed, the plan is explicit.  "Currently, all of the land covered by this Site Plan for Subdivision is unplatted. . . . The goal is to . . . plat all of these tracts."  Furthermore, as the IFA indicated, even after a platting pattern has been established for individual lots, there are at least two further required approvals, one for a preliminary plat, and another for a final plat.  At that time, a developer would be free to apply for a building permit. Because Developers had only received approval of an unplatted site plan, they did not receive common law vested rights.  The law is well-established.  Developers purchased a piece of property which had successfully completed an early stage in the approval process.  Based on that approval, Developers continued to expend money and resources in furtherance of completing the development.  Understandably, Developers argue that they  had vested rights at common law.  But such an approval, at such an early stage, remained subject to several subsequent committee approvals and conferred no discernable right to continue in the development process as contemplated in the site plan.

**{24}**    Developers' insistence that the EPC's March 2001 approval gave them vested rights pursuant to the language of the ordinance is understandable, but as the above analysis indicates, *Brazos Land*, when considered alongside *Gallup Westside Development* and *Sundance Mountain Ranches*, clearly leads to the conclusion that no vested rights were created at common law.  What is more, if common law vested rights had been created as Developers assert, those rights would exempt Developers from the *entire* impact fee ordinance, not just the exception regarding vested rights.  Developers' reliance on the common law to selectively interpret the ordinance results in much confusion.  At every step in this matter, Developers have dovetailed the ordinance with the doctrine of common law vested rights.  The two are distinct, and we reject such an analysis.

**{25}**    We also reject Developers' argument that because Phase 3/Tract 1C was not a "new development" under the ordinance, the ordinance is entirely inapplicable. Developers' brief provides no citation to the record demonstrating where this argument was preserved, and our review reveals none.  Appellate courts will not consider issues that went unpreserved at the district court level. *Aragon & McCoy v. Albuquerque Nat'l Bank*, 99 N.M. 420, 424, 659

10

P.2d 306, 310 (1983).

## D. THE DISTRICT COURT IMPROPERLY INVALIDATED THE ORDINANCE'S TWO-YEAR SUNSET PROVISION

**{26}** Finally, we consider the district court's invalidation of the ordinance's two-year sunset provision. As stated above, the ordinance provides that "[v]ested rights arising from approvals shall expire if a building permit has not been issued within two years from the effective date and impact fees may be assessed and collected thereafter." ROA § 14-19-(1-4)-12(D); DPM ch. 18, § 3(B)(2)(c)-(d). The district court reasoned that "[v]ested rights are considered established rights which cannot be taken away arbitrarily[.]" Therefore, the ordinance was "void and of no effect." Again, this analysis finds root in the common law, not the ordinance itself. As such, it is incorrect. As we discuss above in detail, vested rights under *Brazos Land* are different from the vested rights contemplated by the ordinance at issue here. Admittedly, the district court was correct in its reading of common law vested rights. Such rights cannot be arbitrarily taken away. However, this ordinance does not take away such rights. It simply states that even if a developer qualifies for the exemption, it must still pay impact fees if it does not apply and receive a building permit for the project within two years. The sunset provision does not divest developers of common law vested rights, and we hold that it remains valid.

## CONCLUSION

**{27}** For the reasons stated above, we reverse the order of the district court and hold that the March 2001 EPC approval of Developers' original site plan for subdivision was insufficient to confer vested rights under either the ordinance or the common law. We also hold that the district court's invalidation of the ordinance's sunset provision was error.

**{28}    IT IS SO ORDERED.**

_____
**RODERICK T. KENNEDY, Judge**

**WE CONCUR:**

_____
**CYNTHIA A. FRY, Chief Judge**

_____
**CELIA FOY CASTILLO, Judge**

**Topic Index for *Andalucia Development Corp., Inc. v. City of Albuquerque*, Docket No. 28,407**

**AE                    APPEAL AND ERROR**

**AE-SR**                    Standard of Review

**GV**                    **GOVERNMENT**
**GV-LU**                Land Use
**GV-MU**               Municipalities
**GV-OR**                Ordinances
**GV-ZL**                Zoning Law

**PR**                    **PROPERTY LAW**
**PR-SU**                Subdivisions
**PR-VR**                Vested Rights